FILED
U.S. DISTRICT COURT
AUGUSTA DIV.
2008 JUN 30 AM 11: 51
CLERK
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 107-122 |
| | ) | |
| JIMMY BONAPARTE | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Jimmy Bonaparte ("Bonaparte") has filed a motion for a determination of competency to stand trial on the grounds that "there is reasonable cause to believe that the defendant is presently suffering from a mental disease or defect" that renders him "unable to understand the nature and consequences of the proceedings against him or capable of rendering counsel assistance in providing a proper defense." (Doc. no. 34, p. 1). Pursuant to the February 11, 2008 Order of the Honorable Dudley H. Bowen, Jr., United States District Judge, Bonaparte has undergone a mental examination. (Doc. no. 35). The Court held an evidentiary hearing beginning on June 12 and concluding on June 18, 2008, during which the Court heard testimony from Dr. Rodolfo A. Buigas, the Forensic Exam Coordinator, Louise Ferguson, Bonaparte's former girlfriend, Bureau of Alcohol, Tobacco, Firearms, and Explosives Special Agent Ralf Bicknese, Captain Christopher Durden of the McDuffie County Sheriff's Department, and Bonaparte. For the reasons that follow, the Court **REPORTS** and **RECOMMENDS** that Bonaparte be determined competent to stand trial.

## I. BACKGROUND

In an indictment filed on November 9, 2007, Bonaparte was charged with three counts of Distribution of Cocaine and Marijuana and one count of being a Felon in Possession of Ammunition.[1] As noted above, on February 11, 2008, Judge Bowen granted Bonaparte's motion for a psychiatric examination and ordered Bonaparte into the custody of the United States Bureau of Prisons for the purpose of evaluating Bonaparte's competency to stand trial, as well as his responsibility at the time of the acts alleged in the indictment. Bonaparte was transferred to the Federal Detention Center ("FDC") in Miami, Florida on March 17, 2008.

Bonaparte subsequently underwent nearly two months of observation and evaluation in the FDC, and the staff evaluating Bonaparte submitted a Forensic Evaluation Report ("FER") dated May 14, 2008. (Doc. no. 38, under seal). Evaluators at the FDC received various documents concerning Bonaparte, including agent reports, the indictment, the case activity log, and a letter allegedly written by Bonaparte to a potential witness in the case. Evaluators also interviewed the prosecutor, Bonaparte's court-appointed attorney, and FDC-Miami Correctional Services staff members who reported their observations of Bonaparte's adaptive and interpersonal skills.

---

[1] Bonaparte's three prior felony convictions were (1) Robbery in the Third Degree, convicted May 7, 1992 in the Supreme Court of New York; (2) Attempted Criminal Sale of a Controlled Substance in the Third Degree, convicted July 3, 1995 in the Supreme Court of New York; and (3) Criminal Sale of a Controlled Substance in the Fifth Degree, convicted August 9, 1995 in the Supreme Court of New York.

As part of the evaluation, Bonaparte underwent seven and one half hours of psychological testing and clinical interviews by psychology staff members and Dr. Buigas. Testing procedures employed were the Validity Indicator Profile (VIP), the Booklet Category Test - Second Edition (BCT), the Wechsler Abbreviated Scale of Intelligence (WASI), the Structure Interview Reported Symptoms (SIRS), the Wide Range Achievement Test - Fourth Edition (WRAT-4), the Minnesota Multiphasic Personality Inventory - Second Edition (MMPI-2), and the Georgia Court Competency Test - Mississippi State Hospital (GCCT-MSH).

## II. THE HEARING AND THE FORENSIC REPORT

### A. Louise Ferguson

Bonaparte offered the testimony of his former girlfriend Louise Ferguson, who stated that she had known him for fourteen (14) years and had been married to him for ten (10). She said Bonaparte told her that he never graduated from high school and that he could neither read nor write. Oddly, she said Bonaparte could not spell! During the 10 years they were together, six months was the longest period of time he had ever held a job. He could not look up a telephone number in the telephone book, and he did not know how to write a check. Ms. Ferguson added that Bonaparte did not understand the seriousness of the charges, nor could he accept that he had done anything wrong. She stated that defense counsel had asked her to explain the charges and the evidence against him and that he had accused her and Bonaparte's lawyer of being in cahoots and trying to get high in jail. She also stated that in the past he had outbursts where he threatened to kill her and her children.

It was also alleged that while in the local jail awaiting trial, Bonaparte had made bizarre statements concerning his lawyer. On one occasion, Bonaparte was alleged to have asked jail officials to equip him with a bullet proof vest before meeting with his attorney, as he was afraid his attorney would shoot him.

**B.     Bonaparte**

Bonaparte testified that he had been called "incompetent since he was a child and had been treated for mental illness as a child. He stated that he could neither read nor write. He described himself as a "hyperactive" child who "got left back three times" in school even though he only attended special education classes. He stated that he had given his best effort during the evaluation at the FDC in Miami. Interestingly, he admits the mental acuity to "play cards" and basketball with other jail inmates.

On cross-examination, Bonaparte at first denied ever having a cellular telephone, stating, "I ain't John Gotti." He later admitted having a cellular telephone, no doubt after realizing he was videotaped during the undercover investigation using a cellular telephone. He maintained, however, that the only calls he was capable of making were to his girlfriend, Ms. Ferguson. A video recording made during the undercover operation, however, clearly depicts Bonaparte looking up telephone numbers from a note and making telephone calls. The Court concludes that Bonaparte continued his malingering during his testimony before the Court.

**C.     Dr. Buigas**

Dr. Buigas testified via telephone in support of his forensic evaluation report and reinforced the finding in the report that Bonaparte was clearly competent to stand trial, had

4

grossly exaggerated his symptomology, had failed to exert sufficient effort during intelligence testing and was an obvious malingerer. Dr. Buigas reported that initially, Bonaparte had denied any history of psychiatric illness or treatment - contradicting Bonaparte's testimony during the hearing. Bonaparte also admitted an extensive history of polysubstance abuse involving alcohol, cocaine, marijuana, and phencyclidine/PCP. Bonaparte had also reported completion of the twelfth grade, albeit in special education classes.

Dr. Buigas stated that when Bonaparte was administered the WASI, it resulted in a full scale IQ of 57, or mild mental retardation level of intellectual functioning. He stated, however, that there were several reasons to suggest that Bonaparte did not give his best effort during the test. First, an IQ of 57 would strongly suggest impairment in the activities of daily living, and staff observations of Bonaparte during the nearly two months at the FDC revealed no such problems. He also said that a mild mental retardation classification would require an initial classification prior to age 18, and Bonaparte reported no such history. Dr. Buigas further stated that an IQ of 57 reflected a "very disturbed" finding, not even along the lines of someone who is merely depressed or even a stable schizophrenic but comparable instead to a "very progressed dementia" or an "acutely uncontrolled, highly disorganized schizophrenic." Dr. Buigas was clear that Bonaparte's intellectual functioning was far superior to the indications of his test results.

Dr. Buigas also reported that when Bonaparte was administered the BCT to detect the presence of neuropsychological impairment, Bonaparte again scored in the mildly impaired range of functioning. He stated, however, that the test results again suggested that Bonaparte was intentionally exaggerating or fabricating neuro-cognitive impairment.

When administered the VIP test, a measure designated to detect an individual's response style on measures of similar cognitive abilities in tests that are administered concurrently, Bonaparte's responses were "random." Dr. Buigas stated emphatically that a mentally retarded person would not respond in that fashion. He explained that the VIP test is based on an intelligence test so that the person being tested would "do better on the easy items and worse on the [more difficult] items." Bonaparte's responses did not follow that pattern but rather were "random on the easy items." According to Dr. Buigas, Bonaparte correctly answered approximately one half of the questions "correctly answered by individuals who are not severely mentally retarded." (FER, p. 7).

Another test given to Bonaparte, the SIRS test, is described in the FER as one designed to "systematically assess deliberate distortions in the self report of psychiatric symptoms." (Id. at 7). The report states that Bonaparte:

> ... endorsed patterns and a total number of symptoms not typically found in specific psychiatric conditions and [is] suggestive of the gross exaggeration or fabrication of psychiatric symptoms. Specifically, the defendant endorsed rare symptoms, improbable symptom combinations, blatant symptoms, selective symptoms, discrepancy between reported versus observed symptoms, inconsistent symptoms, overly specific symptoms and unusual symptom onset and resolution patterns.

6

(Id.). In brief, Dr. Buigas testified that Bonaparte endorsed so may symptoms from so many mental diseases and defects that he actually endorsed combinations unknown to medical science, *i.e.*, combinations that do not exist.

Dr. Buigas also stated that Bonaparte tested very well concerning his knowledge of the criminal justice system. The GCCT-MSH, which embraces the federal standard for competence to stand trial was administered, and Bonaparte scored 86%, which clearly establishes competency. Although Bonaparte achieved an 86% score on the GCCT-MSH, the FER reflects that Bonaparte attempted "to relay bizarre symptoms to his legal situation. For example, he indicated that . . . the police used mind control to get him to confess. Such atypical items are rarely endorsed by genuine psychiatric populations." (Id. at 9).

The FER also states that Bonaparte had "an adequate understanding of the legal process and courtroom roles overall." (Id. at 9). In this regard, the FER states:

> The defendant relayed an adequate understanding of the legal process and courtroom roles overall. He indicated that the jury "decide[s] if [I] fit to go home, not guilty," that the defense attorney's role was to "help you go home, [prove] not guilty," and that the prosecutor's role was to provide the defendant's guilt. . . . . Further the defendant indicated that he could assist with his defense by "telling him (attorney) the truth and work with him."

(Id. at 9). Notably, the Court also observed during the lengthy competency hearing that Bonaparte is clearly capable of consulting with his counsel and properly assisting in his own defense. Likewise, Bonaparte's responses to his questions during the hearing demonstrate that Bonaparte has the ability to understand the nature and consequences of the proceedings.

On cross examination, defense counsel made much of the fact that Dr. Buigas never retrieved Bonaparte's school records or interviewed Bonaparte's family members. Dr.

7

Buigas responded that in his experience, family members were very poor historians because of their obvious interest in the proceedings. Regarding Bonaparte's school records, Dr. Buigas pointed out that Bonaparte had denied any history of psychiatric illness or treatment and that in his experience the vast majority of recognizable mental illnesses were chronic diseases. He stated that the fact that Bonaparte clearly had no current mental illnesses of any sort, investigation of his psychiatric history was simply unwarranted. Dr. Buigas classified cognitive impairments such as mental retardation as being lifelong conditions similar to bipolar disorder and schizophrenia. Since Bonaparte exhibited none of these impairments as an adult, it is very unlikely that he exhibited them as a child.

### D.  Special Agent Bicknese

Special Agent Bicknese, who has been with the Bureau of Alcohol, Tobacco, Firearms and Explosives for 19 ½ years, testified concerning his interactions with Bonaparte during the undercover operation leading to the indictment in the instant case. He testified that the operation was designed to identify local gang members and to purchase narcotics, firearms, and stolen automobiles. At the hearing, SA Bicknese described one encounter with Bonaparte in which he (Bonaparte) entered the undercover location and stated that he had three boxes of .22 caliber ammunition and escorted the agents to the location where the bullets were stashed, retrieved them, and delivered them to the agents. SA Bicknese described Bonaparte in his dealings with the agents as a "street level businessman" who was "an aggressive negotiator." SA Bicknese stated that Bonaparte spoke clearly, expressed clear thoughts, and displayed no erratic behavior patterns.

## III. DISCUSSION

The issue before the Court is one involving Bonaparte's competency to stand trial, even though the scope of Judge Bowen's examination order was much broader. Title 18 U.S.C. § 4241 provides the standard for determining competency and the consequences for a finding of competency. In pertinent part, the Code section provides:

> **(d) Determination and disposition.**--If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

18 U.S.C. § 4241(d). From the Code section, the United States Court of Appeals for the Eleventh Circuit has framed the competency inquiry thus: "The legal test for competency is whether the defendant ha[s] 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and whether he ha[s] 'a rational as well as factual understanding of the proceedings against him." United States v. Nickels, 324 F.3d 1250, 1252 (11th Cir. 2003) (*per curiam*) (citing United States v. Cruz, 805 F.2d 1464, 1479 (11th Cir. 1986)). With this standard in mind, the Court turns its attention to the issue at hand.

As to whether Bonaparte has the ability to consult with his lawyer and assist with his defense, the Court easily concludes that he does. As recited in detail above, the evidence clearly shows that Bonparte has the necessary ability. The Court credits the testimony of Dr. Buigas and the evidence in the FER over the obviously self-serving testimony of Bonaparte and the testimony of Ms. Ferguson. The expert medical evidence is based on extensive and

thorough scientific testing and observation.  Moreover, the Court notes that its own observation of Bonaparte during the lengthy competency hearing bears out the conclusions of Dr. Buigas and the FER.  Bonaparte displayed no aberrant behavior and acted appropriately for the courtroom.  He was attentive and followed the proceedings closely.  He communicated with counsel at appropriate times during the hearing and suggested questions for counsel to ask.

Concerning the issue of whether Bonaparte understands the substance and potential consequences of the charges pending against him, again the Court easily concludes that he does.  The Court specifically credits the testimony of Dr. Buigas and SA Bicknese over that of Bonaparte and Ms. Ferguson as to whether Bonaparte has a factual understanding of the charges against him.  Again, Dr. Buigas's conclusions are supported by extensive and thorough scientific testing and observation. SA Bicknese, an experienced law enforcement officer, described Bonaparte as "street level businessman" who was "aggressive negotiator" that could make a deal, understand what was required to consummate the transaction, and see the deal through to its conclusion.

Upon consideration, the Court **FINDS** by a preponderance of the evidence that Bonaparte has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and that he has a rational as well as factual understanding of the proceedings against him.  The evidence adduced at the hearing, including Dr. Buigas's forensic report and testimony, as well as the testimony of SA Bicknese, amply support the Court's finding.  Taken in total, the Court is more than confident that Bonaparte is legally competent to stand trial under the standard set forth in § 4241 and in Nickels.

## IV. CONCLUSION

For the foregoing reasons, the Court **REPORTS** and **RECOMMENDS** that Bonaparte be determined to be competent to stand trial within the meaning of 18 U.S.C. § 4241.

SO REPORTED and RECOMMENDED this 30th day of June, 2008, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE